NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**HECTOR FIGUEROA,**

                    **Plaintiff,**

**-vs-**                                          **Case No. 6:12-CV-551-28KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                    **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Hector Figueroa seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 11, 12, and the parties' memoranda, Doc. Nos. 15, 18. This matter has been referred to the undersigned for issuance of a Report and Recommendation.

## PROCEDURAL HISTORY.

In 2008, Figueroa filed applications for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the "Act").  He alleged in the OASDI

application that he became disabled on September 2, 2007, R. 129, and in the SSI

application that he became disabled on October 27, 2007, R. 125.

After his applications were denied initially and on reconsideration, an administrative

law judge ("ALJ") held a hearing at Figueroa's request.  Figueroa, represented by an

attorney, and a vocational expert ("VE") testified at the hearing.  R. 25-41.

After considering the testimony and the medical evidence presented, the ALJ

determined that Figueroa was insured under OASDI through December 31, 2011.  R. 14.

The ALJ found that Figueroa had not engaged in substantial gainful activity since the alleged

disability onset date of October 27, 2007.  *Id.*

The ALJ concluded that Figueroa had bipolar disorder, which was a severe

impairment.  R. 14.  This impairment would result in moderate difficulties in activities of daily

living, social functioning and concentration, persistence or pace with one or two episodes of

decompensation of extended duration.  R. 15.  The ALJ found that Figueroa's impairments

or combination of impairments did not meet or equal any listed impairment.  R. 14.

The ALJ found that Figueroa had the residual functional capacity ("RFC") to do the

following:

> [P]erform a full range of work at all exertional levels but with the
> following nonexertional limitations: limited to work that is simple
> with only occasional contact with the public (eliminating retail
> sales and client assistance desk positions), no high-production
> stress (eliminating assembly line positions), no driving of
> commercial vehicles.  The claimant is to avoid work with
> exposure to unprotected heights and work with exposure to
> moving machinery.

R. 16.  In making this assessment, the ALJ gave significant weight to the RFC assessments prepared by Bruce Hertz, Ph.D., a reviewing psychologist.  R. 18 (citing Ex. 8F at 11).

The ALJ concluded that Figueroa had no past relevant work.  R. 18.  Based on the testimony of the VE, the ALJ also concluded that there were jobs available in the national economy that Figueroa could perform.  R. 19.  Therefore, the ALJ concluded that Figueroa was not disabled.  *Id.*

Figueroa sought review of the ALJ's decision by the Appeals Council.  R. 7.  On March 8, 2012, the Appeals Council issued a decision finding no basis to change the ALJ's decision.  R. 1-3.

Figueroa seeks review of the Commisioner's decision by this Court.

### JURISDICTION AND STANDARD OF REVIEW.

Figueroa having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).  A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) (citations omitted), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

### SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the parties' memoranda and in the ALJ's decision.  Accordingly, I will only summarize facts necessary to address the issues raised in order to protect Figueroa's privacy to the

NOT FOR PUBLICATION

extent possible.

Figueroa was born in 1968.  R. 129.  He had previously worked as a chef in a restaurant he owned and as an electrical engineer.  R. 29.

Figueroa explained to the ALJ that after his mother died in October 2007, he began hearing voices that, among other things, convinced him to close his restaurant.  R. 29, 198.  He withdrew, refusing to answer the telephone.  He eventually slept on the street.  When he was arrested in South Carolina for trespassing, his sister found him, and he received treatment at Park Place Behavioral.  R. 30-31, 398-99.  Thereafter, he continued to have episodes in which he heard voices that gave him instructions what to do.  R. 32.  As a result of these events, he lost his restaurant, his home, his vehicles and his personal belongings.  R. 33-34, 198.

Medical records confirm that Figueroa was treated at Park Place Behavioral Healthcare ("Park Place") beginning on October 27, 2007.  R. 287.  The initial diagnosis was schizoaffective disorder with a global assessment of functioning ("GAF") score of 35.[1]  R. 291.  On October 29, 2007, the assessment was psychosis not otherwise specified ("NOS") with a GAF score of 25.[2]  R. 292. Figueroa was discharged on November 2, 2007.  R. 298.  Thereafter, Figueroa returned to his home in Ohio.  R. 300; *see also* R. 398.

---

[1]  Treatment providers use the global assessment of functioning scale to judge a patient's overall level of functioning during a particular time.  This is a 100-point scale, with 100 representing the highest level of functioning.  A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (eg, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (eg, depressed man avoids friends, neglects family, and is unable to work . . . .).  Harold I. Kaplan, M.D., and Benjamin J. Sadock, M.D., *Synopsis of Psychiatry* at 298-99 (8th ed. 1997) (hereinafter "*Synopsis of Psychiatry*").

[2]  A GAF score of 21 to 30 reflects "[b]ehavior is considerably influenced by delusions or hallucinations  OR serious impairment in communication of judgment (eg, sometimes incoherent, acts grossly inappropriately, suicidal preoccupations) OR inability to function in almost all areas (eg, stays in bed all day; no job, home, or friends)."  *Synopsis of Psychiatry* at 299.

Figueroa was again admitted to Park Place on January 4, 2008.  R. 272.  He reported having hallucinations.  He was incoherent with aggressive behavior.  *Id.*  He stated, "'I'm God.'"  R. 279.  The diagnosis was bipolar I manic and alcohol dependence, with a GAF score of 25.  R. 277.  Figueroa was treated with medication and discharged on January 9, 2008.  R. 282-83.

Figueroa continued outpatient treatment at Park Place through March 2011.  R. 264-70, 322-36, 358-68, 402.  On February 1 and March 6, 2008, the treatment provider assessed his GAF score as 45.[3]  Figueroa's mood was depressed and his affect was blunted. R. 264, 327.  On April 29, 2008, the treatment provider noted that Figueroa's speech was rapid at times, his mood was depressed and his affect was blunted.  Figueroa reported visual hallucinations.  R. 326.  On July 16, 2008, Figueroa told the treatment provider that he was again hearing voices.  His GAF score was 45.  R. 325.  On August 13, 2008, Figueroa stated that his mood was better, and the treatment provider noted that he was euthymic and logical.  Nevertheless, his GAF score remained at 45.  R. 324.

Written reports of contact with family members reflect that, in 2008, Figueroa could drive to the store and purchase items he needed.  He was able to care for his personal needs.  He could remember what he needed to do.  He was able to pay his bills.  He still had bouts of feeling sad and depressed when he "seems out of it for a bit," but not as bad as previously.  R. 198.

Two psychologists prepared mental RFC assessments after review of Figueroa's records. In the first of these assessments, called a Psychiatric Review Technique ("PRTF"),

---

[3]  A GAF score of 41 to 50 reflects "[s]erious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (eg, no friends, unable to keep a job)."  *Synopsis of Psychiatry* at 299.

the psychologist determines a claimant's mental impairments and rates the functional limitations arising from the impairments as none, mild, moderate, marked or extreme.[4]   *See, e.g.,* R. 306-18. In the second of these assessments, called a Mental Residual Functional Capacity Assessment, the psychologist first checks boxes to state summary conclusions about specific functional limitations in various categories, then completes Part III, called Functional Capacity Assessment, which directs the psychologist to elaborate or clarify the summary conclusions.  *See, e.g.,* R. 302-04.

On March 18, 2008, Cheryl Woodson, Psy.D., opined in the PRTF that Figueroa would have mild limitations in activities of daily living and social functioning, moderate limitations in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration.  R. 316.  In the "Functional Capacity Assessment" of the mental RFC assessment form, Dr. Woodson wrote that Figueroa "will encounter difficulties handling complex or detailed tasks.  [His] ability to attend/concentrate for extended periods on complex tasks due to his racing thoughts and ruminations.  [His] ability to adhere to schedules is retained as is his ability to complete work week requirements with only a slight probability of interruption due to his psychiatric [symptoms]." R. 304.

On August 26, 2008, Bruce Hertz, Ph.D., opined in the PRTF that Figueroa would have moderate limitations in activities of daily living, social functioning and concentration, persistence or pace with one or two episodes of decompensation each of extended duration. R. 351.  In the summary conclusions section of the mental RFC assessment form, Dr. Hertz

---

[4]  The psychologist rates episodes of decompensation as none, one or two, three, four or more. *See* R. 316.

checked boxes dealing with Figueroa's ability for sustained concentration and persistence. He indicated, among other things, that Figueroa would not be significantly limited in the ability to carry out very short and simple instructions, perform activities within a schedule and maintain regular attendance, and sustain an ordinary routine without special supervision, and that Figueroa would have moderate limitations in the ability to work a normal workday and workweek without interruptions from psychologically based symptoms. R. 337-38.  In the "Functional Capacity Assessment" portion of mental RFC form, Dr. Hertz wrote as follows:

> The claimant has been displaying symptoms of bipolar disorder. As a result of treatment interventions, there has been a significant degree of stabilization. Prior to medications, the claimant was displaying active signs of psychosis.  Those psychotic symptoms are not currently displayed.  The claimant reportedly has decreased depressive symptoms, and there are no significant problems with regard to memory and concentration. The claimant has the capacity to understand and carry out at least simple instructions and tasks.  He takes care of personal grooming and hygiene, but requires encouragement at times to carry out some of his routine daily tasks.  The claimant is capable of driving automobile, and shops independently.  He is able to manage his own finances.  The claimant does have the ability to interact with people well enough to take care of necessary daily responsibilities although he generally chooses not to interact a great deal with others.
>
> The overall indication is that while there are some mental deficits present, they will not prohibit this claimant from carrying out at least routine daily functions independently.

R. 339.

After these mental RFC assessments were prepared, records from Park Place reflect that Figueroa's condition waxed and waned.  On September 17, 2008, Figueroa reported having a visual hallucinations three weeks earlier.  He had a GAF score of 48.  R. 359.  On

January 9, 2009, his mood was euthymic, with a GAF score of 50.  R. 361.  On March 9, 2009, Figueroa reported some cycles of depression that were getting worse.  The treatment provider noted that his mood was mildly depressed.  The GAF score was 57.[5]  R. 362. On April 9, 2009, Figueroa reported being less depressed.  His GAF score was 52.  R. 363.  In May and July 2009, Figueroa indicated that he was doing ok.  His GAF score was 54.  R. 364.  On September 22, 2009, Figueroa reported that he was better.  His GAF score was 54.  R. 366.

On January 14, 2010, Figueroa reported that he had again had auditory and visual hallucinations.  The GAF score was 50.  R. 367.  On February 25, 2010, Figueroa reported that he was more depressed.  He had experienced hallucinations 3 to 4 days the previous month.  The treating professional observed that Figueroa was unshaven and his grooming had decreased. The GAF score was 48.  R. 368.

Joseph N. DeLuca, M.D., Ph.D., examined Figueroa on March 15, 2010.  Figueroa reported visual and auditory hallucinations despite taking medication.  He denied using alcohol. R. 393.  Dr. DeLuca administered a number of psychological tests.  R. 395.  A Beck Depression Inventory - II test confirmed that Figueroa was depressed.  R. 393.  Dr. DeLuca observed upon examination that Figueroa's cognitive functioning was adequate, but there was evidence of disturbance in thought content manifested by paranoid delusional thinking. No deficits were noted in memory, concentration or orientation, and impulse control and social judgment appeared to be within normal limits.  R. 394.  Dr. DeLuca opined that Figueroa had a schizo-affective disorder with a GAF score of 30.  He indicated that Figueroa

---

[5]  A GAF score of 51 to 60 reflects "[m]oderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupation, or school functioning (eg, few friends, conflict with peers or coworkers)." *Synopsis of Psychiatry* at 299.

Not for Publication

"has significantly impaired social functioning, task persistence, concentration difficulties, and deterioration in work-like settings." R. 395. Dr. DeLuca prepared a mental RFC questionnaire. He indicated that Figueroa would have poor to no ability to make occupational adjustments. R. 396.

Thereafter, Figueroa continued treatment at Park Place. On April 28, 2010, Figueroa was isolating himself. His GAF score was 48. R. 383; *see also* R. 198. On May 6, 2010, Figueroa reported that he was a bit better. The treating professional observed that he had mild anxiety, with a GAF score of 52. R. 384.

At the time of the ALJ's hearing July 2010, Figueroa was living with his father. R. 35. He kept mostly to himself. R. 34. He still heard voices once in a while. R. 35.

In March 2011, Figueroa reported being depressed but he did not have hallucinations. His GAF score was 49. R. 402. Figueroa stated he was "ok" in April 2011. His GAF score was 45. R. 403. In May 2011, he reported that he was not good. His affect was observed to be dysphoric with a GAF score of 45. R. 404. In June 2011, he was observed to have increased anxiety, with a GAF score of 45. R. 405. In July, 2011, he reported mood swings. His GAF score remained at 45. R. 406.

## TESTIMONY OF THE VE.

At the hearing, the ALJ asked the VE to assume the following hypothetical person:

> [A] younger person with high school education, who can perform work that is simple, in the one to three-steps category. Contact with the public is occasional; rule out retail sales or client assistance desk; cannot tolerate high-production stress, so rule out assembly lines; no driving of commercial vehicles; no work at unprotected heights or in close proximity to moving, dangerous machinery.

NOT FOR PUBLICATION

R. 39.  The VE testified that this person could perform the following jobs: kitchen helper (medium, SVP 2); cleaner/housekeeper (light, SVP 2); and landscape laborer (heavy, SVP 2).[6]  *Id.*

Figueroa's counsel asked the VE to assume the following additional limitations:

> [C]laimant has to have oral instructions written down.  He requires encouragement to complete activities. . . . [He] prefers not to socialize and prefers to be alone, and the claimant does not handle stress well . . . . [His] ability to maintain attention and concentration is poor, and his ability to handle and deal with work stresses is poor, and his ability to follow work rules is poor, his ability to interact with supervisors is poor.

R. 39-40.  The attorney defined "poor" as having "no useful ability to function in a particular area."  R. 40.  The VE testified that, with these additional limitations, there would be no work the hypothetical person could perform.  *Id.*

### ANALYSIS.

Figueroa asserts two assignments of error.  He contends that the ALJ erred by failing to address specifically the GAF scores contained in the Park Place medical records and certain of Dr. Hertz's findings about his functional limitations.  He also contends that the ALJ did not include moderate limitations in concentration, persistence or pace in the hypothetical question to the VE or explain, explicitly or implicitly, how those limitations were accounted for in the hypothetical question.  These are the only issues I will address.[7]

---

[6]  "The DOT [*Dictionary of Occupational Titles*] lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." Social Security Ruling 00-4p, 2000 WL 1898704 at * 3 (Dec. 4, 2000).

[7]  The parties were advised in the Scheduling Order that issues not specifically raised may be waived.  Doc. No. 14 at 2.

NOT FOR PUBLICATION

*Treatment of the Medical Records.*

In the decision, the ALJ wrote that the Park Place records did not include any assessment of Figueroa's capacity.  R. 17.  Figueroa contends that this is inaccurate because the GAF scores in those records were, effectively, assessment of his mental capacity.  The Commissioner contends that what the ALJ meant was that the Park Place records did not contain a mental RFC assessment of the type completed by Drs. Woodson, Hertz and DeLuca.  She argues, further, that the ALJ implicitly acknowledged the GAF scores in the statement that "'assessment notes of cognitive function, memory, concentration, attention, and judgment are in the record.'"  Doc. No. 18 at 8 (quoting R. 17).

In *Winschel v. Commissioner of Social Security*, 631 F.3d 1176 (11th Cir. 2011), the United States Court of Appeals for the Eleventh Circuit reversed the decision of the district court, in part because "the ALJ did not discuss pertinent elements of the examining physician's medical opinion" contained in his treatment notes.  *Id.* at 1179.  GAF scores are part of the treating professionals' opinions contained in the Park Place treatment notes, but they were never mentioned by the ALJ.  While a GAF score is only a snapshot of a person's functioning at a given moment in time, Figueroa's GAF scores viewed over the continuum of his treatment at Park Place show that he consistently had serious limitations in functioning, with some remission in 2009 during which he still had moderate limitations in functioning.

Records from Figueroa's only long-term treatment provider contain assessments of his functional abilities through GAF scores, which did not change significantly despite findings on various visits that Figueroa's condition had improved somewhat.  Under these circumstances, the ALJ's finding that the Park Place records do not contain assessments of Figueroa's functional capacity is not supported by substantial evidence.  It may be, as the

NOT FOR PUBLICATION

Commissioner argues, that the ALJ considered the GAF scores and rejected them, "but without clearly articulated grounds for such a rejection, [the Court] cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence." *Winschel*, 631 F.3d at 1179.  Due to this deficiency, I recommend that the Court find that the first assignment of error is well taken.

*Opinion of Dr. Hertz and the Hypothetical Question to the VE.*

The ALJ concluded that Figueroa would have moderate limitations in concentration, persistence or pace.  In his analysis of this limitation, the ALJ noted that Figueroa would have difficulties with following and understanding complex or detailed instructions.  R. 15.  This finding was consistent with the opinion of Dr. Hertz, which opinion the ALJ gave significant weight.  However, the ALJ did not discuss Dr. Hertz's additional summary conclusion as to concentration and persistence, which was that Figueroa would be limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.

Figueroa contends that the ALJ was required to include moderate limitations in concentration, persistence or pace expressly in the hypothetical question or explain how the ALJ implicitly included those limitations in the hypothetical question.  This argument is based on *Winschel*, in which the Eleventh Circuit found that the VE's testimony could not support the ALJ's finding that Winschel could perform work available in the national economy because the hypothetical question did not include or implicitly account for moderate limitations in concentration, persistence or pace.  631 F.3d at 1181.

The Commissioner contends that Dr. Hertz translated his summary conclusions from the mental RFC form into functional limitations in Part III of that form.  Dr. Hertz wrote that

NOT FOR PUBLICATION

Figueroa "has the capacity to understand and carry out at least simple instructions and tasks," which limitation the ALJ included in both the RFC and hypothetical question.

Dr. Hertz did not, however, elaborate on or clarify his finding that Figueroa would be moderately limited in the ability to perform a normal workday and workweek in Part III of the form.  The Commissioner suggests that the ALJ relied on Dr. Woodson's conclusion that Figueroa could "complete work week requirements with only a slight probability of interruption due to his psychiatric [symptoms]," R. 304, as a basis not to include this limitation in the RFC or hypothetical question to the VE.  There is no support for this argument in the record.  Dr. Woodson's conclusion was based on her finding that Figueroa would not be significantly limited in the ability to complete a normal workday and workweek due to interruptions from psychologically based symptoms.  R. 303.  In contrast, Dr. Hertz, found that Figueroa would have a moderate degree of limitation in this area. R. 338. Because Dr. Woodson's functional capacity assessment was not based on the same summary conclusion as that reached by Dr. Hertz, Dr. Woodson's functional capacity assessment in Part III of the mental RFC form she completed is not applicable to Dr. Hertz's opinion.

Under *Winschel*, the ALJ was obligated either to find explicitly that, despite moderate limitations in concentration, persistence or pace, Figueroa could perform a normal workday and workweek without interruptions psychologically based symptoms or explain how the RFC and hypothetical questions implicitly accounted for that limitation.  Having failed to do so, the VE's testimony does not constitute substantial evidence supporting the ALJ's finding at step five of the sequential evaluation.  Therefore, these assignments of error are also well taken.

NOT FOR PUBLICATION

## RECOMMENDATION.

Due to the errors identified by Figueroa, I respectfully recommend that the Court **REVERSE** the Commissioner's decision pursuant to sentence four of § 405(g) and **REMAND** the case for further proceedings.  I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its order on this Report and Recommendation and, thereafter, close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** this 19th day of July, 2013.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE